IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Jaclyn Wilson, as mother and next friend of M.W., a minor, Travis Wilson and Jaclyn Wilson, individually,<br><br>          Plaintiffs,<br><br>v.<br><br>Fort Jackson Housing LLC and Balfour Beatty Military Housing Management LLC,<br><br>          Defendants. | 3:24-cv-06599-MGL<br><br><br>**COMPLAINT**<br>***(JURY TRIAL DEMANDED)*** |

Plaintiffs, Jaclyn Wilson, as mother and next friend of M.W., a minor, Travis Wilson and Jaclyn Wilson, individually, (collectively "Plaintiffs") complaining of Defendants Fort Jackson Housing LLC and Balfour Beatty Military Housing Management LLC, and allege as follows:

## NATURE OF THE ACTION

1.      This is an action for personal injury, property damage, breach of contract, and abuse of the landlord-tenant relationship in the context of military housing.  Plaintiffs' claims arise from the Defendants' negligent maintenance and upkeep of military housing including, but not limited to, sewage overflow and hazardous pollution at #5806A Burt Road, Columbia, South Carolina which is located at the Army's Fort Jackson military base ("Fort Jackson").

2.      This action is commenced against the owner/landlord entity, Fort Jackson Housing LLC, a private-public partnership managed and controlled by the Balfour Beatty organization, not subject to governmental immunity, which had the non-delegable duty for managing and maintaining the military houses at Fort Jackson, and Balfour Beatty Military Housing Management

- 1 -

LLC, the designated property manager, which likewise had a duty to manage and maintain military houses for servicemember families including Plaintiffs.

3.      Defendants promised quality housing in exchange for the Plaintiffs' rent payments which, in the military, are paid in the form of Base Allowance Housing ("BAH") but that instead, Defendants provided substandard housing, negligently remediated the problems with the housing, and that the deleterious effects of these problems physically harmed the Plaintiffs, mainly M.W. who is a young child.

4.      Defendants knew, or should have known, that various housing defects at #5806A Burt Road posed potential health hazards yet they failed to warn Plaintiffs about the danger.  This, together with other aggravating factors, supports punitive damages against Defendants.

5.      Despite the foregoing, Defendants, and other military housing companies, argue that modern landlord and tenant laws related to the habitability of housing do not apply to injured victims of defective military housing.  Instead, they say, the "federal enclave doctrine" leaves injury law frozen in time like bugs trapped in amber.

6.      According to Defendants, Fort Jackson and other military housing areas are essentially sanctuaries for obsolete restrictions of the common law and graveyards for the burial of every humane legislation passed for the benefit of landlords and their tenants.  Yet no compelling reason exists to deny military tenants and their families the application of modern landlord and tenant laws.

7.      As then-Congressman James Buchanan observed in 1823, federal enclaves represent a "palpable defect in our system" because "a great variety of actions, to which a high degree of moral guild is attached, and which are punished…at the common law…by every

State…may be committed with impunity [within enclaves.]"  According to Defendants, so it is today with Fort Jackson and other *privatized* housing areas.

## PARTIES AND JURISDICTION

8.     Plaintiffs are residents and citizens of the State of Alabama. Plaintiffs were previously residents and citizens of the State of South Carolina and previously leased the home located #5806A Burt Road in the Fort Jackson Housing area ("Fort Jackson").

9.     Defendant Fort Jackson Housing LLC ("Fort Jackson Housing") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing business in South Carolina.  Fort Jackson Housing is identified as the "Owner" of the premises in Plaintiffs' lease agreement with Defendants.

10.     Defendant Balfour Beatty Military Housing Management LLC ("Balfour") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing business in South Carolina. Balfour is identified as the "Property Manager" in Plaintiff's lease agreement with Defendants.

11.     Upon information and belief, under the facts and circumstances, each of the Defendants has acted as a joint tortfeasor, agent of the others, joint venture participant, or has otherwise engaged in, and aided and abetted one another in, the joint enterprise of leasing military housing at Fort Jackson, as well as the other conduct and acts alleged herein.  On information and belief, during all pertinent times, each of the Defendants was directly and materially involved in the relevant facts, acts, and omissions, so as to incur joint and several liability in this matter due to its direct and material involvement.

12.     In addition, or in the alternative, on information and belief, and to the extent that the evidence shows, and equity may require, during all relevant times there existed a unity of

interest and ownership among Defendants, their predecessors, agents, and parents, such that any individual and corporate separateness among them has ceased, and each such entity may fairly be deemed the alter ego of each other entity.

13.     Plaintiffs' claims arise out of or related to activities that Defendants directed in the State of South Carolina.

14.     The federal government authorized Defendants to build and maintain rental housing for military personnel and their families at Fort Jackson.  Upon information and belief, Defendants were instructed and/or required by the government to maintain the housing in safe and habitable condition.

15.     Although Defendants' construction and maintenance of military housing might have been within the thematic umbrella of their government authorized work, Defendants did not follow the government's explicit instructions.

16.     Defendants are not persons or entities acting under a federal officer so as to give rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity, or government contract defense, primarily because Defendants did not follow the government's explicit instructions and/or requirements as more fully detailed herein below.

17.     This Court has personal jurisdiction over Defendants because of their contacts with the State of South Carolina, the fact that Defendants build, own and manage hundreds of military houses at Fort Jackson in Columbia, South Carolina, and the fact that they derive substantial revenue from managing military housing in South Carolina.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## FACTS

**A. Background of the Military Housing Privatization Initiative ("MHPI")**

19.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

20.    In response to poor housing conditions existing on military bases across the country, Congress enacted the Military Housing Privatization Initiative (the "Privatization Initiative"), Defense Authorization Act, P.L. 104-106, 110 Stat. 186. The Privatization Initiative is a public/private program that, among other things, seeks "to stimulate private sector financing of military housing construction and revitalization projects," S. Rep. No. 104-112, §§ 2811 pp. 329 (1995), and "substantially upgrade military housing on an accelerated basis."

21.    To accomplish this the Privatization Initiative utilizes new "authorities" that permit the military to offer cost-saving and money-earning benefits to private entities as a *quid pro quo* for their provision of base housing and related services to military personnel. *See* 141 Cong. Rec. S18853 (1995) (The Privatization Initiative provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel"). Under the Privatization Initiative, the private commercial entity developer will "own, operate and maintain the houses, and lease the underlying land from the agency for a term of fifty years." Stacie A. Remy Vest, *Military Housing Privatization Initiative: A Guidance Document for Wading Through the Legal Morass*, 53 A.F. Rev. 1, 24 (2002) (internal citations omitted).

22.    Under the MHPI "Tenant Bills of Rights," 10 U.S.C. § 2890, provides that each resident of tenants of housing units managed by a private entity under the MHPI is entitled to the following rights:

   a.    "The right to reside in a housing unit and community that meets applicable health and environmental standards."  10 U.S.C. § 2890(b)(1).

    b.   "The right to reside in a housing unit that has working fixtures, appliances, and utilities and to reside in a community with well-maintained common areas and amenity spaces." 10 U.S.C. § 2890(b)(2).

    c.   "The right to a written lease with clearly defined rental terms to establish tenancy in a housing unit, including any addendums and other regulations imposed by the landlord regarding occupancy of the housing unit and use of common areas." 10 U.S.C. § 2890(b)(4).

    d.   "The right to receive property management services provided by a landlord that meet or exceed industry standards that are performed by professionally and appropriately trained, responsive, and courteous customer service and maintenance staff."  10 U.S.C. § 2890(b)(9).

    e.   "The right to expect common . . . processes for housing units . . . to the maximum extent applicable without violating local, State, and Federal Regulations." 10 U.S.C. § 2890(b)(18).

23.    This initiative allowed the Department of the Army ("Army") and the other military branches to remove themselves from the distractions of day-to-day housing decisions and management and focus on their core mission of defending the United States.

24.    There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations. The DoD considers these houses to be private housing. Service members who are housed on base are paid the prevailing BAH rate for their duty location and required to reimburse the management company of their rental home the full amount of their BAH. Before the advent of the MHPI, the home was provided in lieu of the BAH. This change

creates continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

25.    Twenty years after privatization, in 2016, a DoD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards. Specifically, on October 14, 2016, the DoD Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing."  One "objective was to identify common issues and broader findings."

26.    The 2016 OIG Report summarized prior OIG reports and their findings of "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."

27.    Beginning in 2018, Reuters published a series of award-winning news articles detailing substandard living conditions at U.S. military bases, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

**B.  Defendants' Operation of Military Housing at Fort Jackson**

31.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

32.    Fort Jackson, the 53,000-acre US Army Training Center in Columbia, South Carolina, is the largest and most active entry training center into the US Army in the nation. It trains approximately 45,000 basic training soldiers annually, making up almost 50% of the Army's basic combat trainees and about 60% of all females entering the Army.

33.     Fort Jackson was named after the seventh President of the United States, Andrew Jackson.  It was established in 1917, about a month after the US declared war on Germany during WWI and Congress authorized the President to expand the military. In doing so, Columbia was chosen as the site for a new Army divisional training camp.

34.     The Department of Defense closed Fort Jackson on April 25, 1922, but reactivated the site when WWII started to train and equip more soldiers. Control of the land reverted to the Cantonment Lands Commission, and from 1925 to 1939, it also served as a training area for the SC National Guard. In 1940, it became a permanent base, losing the name "Camp Jackson" and officially became Fort Jackson. During the first and second World Wars, the local training base was responsible for 50-80% of all Basic Combat Training for the US Army.  It was appointed as a US Army Training Center in 1973, and has since grown into a staple for the US Army.

35.     Fort Jackson was originally a collection of privately owned tracts of land. The property was pieced together through cooperative efforts involving the Columbia Chamber of Commerce, the federal government and local residents, many of whom sold their property through eminent domain.  Upon information and belief, the citizens of Columbia donated the land to the federal government, thereby initiating the long tradition of respect, cooperation and friendship between the city and the installation. It was purchased by the citizens of Columbia to show support for President Woodrow Wilson, who had lived here in Columbia during his boyhood days.

36.      Fort Jackson was incorporated into the city of Columbia in October 1968.

37.     In early 2008, Balfour Beatty Communities announced that financing had been secured for the Fort Jackson military family housing project in Columbia, S.C. The financing proceeds would be used for the design, development, and construction/renovation of an aggregate of 850 end-state housing units. The 50-year term of the project included a five-year initial

development period ("IDP"), with IDP costs of approximately $168 million. Niles Bolton and Associates, Atlanta, was the architectural and engineering firm for the project. Balfour Beatty Construction, Atlanta, was to provide construction services.

38.    To accomplish its goals related to the development and management of military housing at Fort Jackson, the Department of the Army ("DOA") entered into a fifty-year lease agreement ("Ground Lease") with Balfour Beatty Communities.  On August 1, 2008, Balfour Beatty Communities began providing property management and maintenance services for the family housing when it entered into agreements with the Army, including a 50-year ground lease, for the purpose of owning and managing the housing inventory. In addition to management fees, with the completion of the project financing, the company would be entitled to earn development and construction/renovation fees throughout the term of the project.

39.    Bruce Robinson, then president and CEO of Balfour Beatty, said, "In these uncertain economic times and with the extraordinary volatility of financial markets, I am extremely pleased with the ability and determination of our team, including our Army partners, to bring this project to a financial close. Having secured the financing will allow us to begin implementing our plan of providing a ***high-quality housing*** community to the military families serving at Fort Jackson." (emphasis added)

40.    Under the Ground Lease, the United States conveyed its rights and interests in the property which is the subject of this action to Balfour for fifty years and, further, conveyed title to all existing personal property (*e.g.,* equipment, appliances, furnishings, etc.) and title to the newly constructed units. Balfour, therefore, pursuant to the Ground Lease, obtained possession control over the renovation, demolition, construction and maintenance of the military housing for Fort

Jackson, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

41.    Prior to or concurrently with the execution of the Ground Lease, Balfour Beatty Communities, as the managing member, and the DOA, as an equity investor only, formed a limited liability company called Fort Jackson Housing LLC.

42.    Under the Ground Lease, the DOA provides limited oversight in order to assure contract compliance. The property, therefore, is under the possession and control of Balfour, the managing member.

43.    In the Ground Lease, the Department of the Army required, and Defendants' assignor agreed, to "observe and comply with, at its sole cost and expense, the provisions of all federal, state and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements which are applicable to the Premises, including . . . those provisions concerning the protection of the environment and pollution control and abatement and occupational safety and health, whether such provisions are now in force or may, at any time in the future, be enacted or directed and, by law, become applicable to and enforceable against the Premises.

44.    Upon information and belief, the Ground Lease states, "[t]he Lessee shall obtain, to the extent required by Applicable Law, all federal, state and local permits and any other approvals required for the Development Management Obligations and at such time as any other future development occurs on the Premises."

45.    Upon further information and belief, the Ground Lease states that the houses are subject to state or local jurisdiction, at any time or times reasonably requested by the Lessee, the Government shall within fourteen (14) days following such request execute such applications for

permits, licenses, vault rental agreements, and/or other permissions, authorizations, approvals and entitlements as are customarily sought or required from public authorities in connection with the development, design, demolition, construction, renovation, operation, management, use and maintenance of projects similar to the Development.

46.     Upon information and belief, the Ground Lease requires Defendants to obtain, as and when required, all required federal, state and local permits related to the development of the Construction Project, and any other approvals required for the construction, operation and management of the Construction Project; provided, however, that any necessary individual building permits, if required, for Housing Units will be secured as construction of the Construction Project proceeds and is completed, and certificates of occupancy ( or their equivalent), if required, will not be obtained until the Housing Units are placed into service.

47.     Plaintiffs are informed and believe that the parties executed an Operating Agreement which mandates *full compliance with all building codes, zoning and licensing requirements*, and other laws, ordinances, regulations, orders and requirements of duly constituted federal, state and local governmental authorities having jurisdiction over the Project.

48.     Upon further information and belief, the Operating Agreement requires the Defendants to use its best efforts to obtain any and all licenses, certificates, permits or approvals that may be required by any governing military, *local, state*, or federal law, ordinances, rules and regulations to operate the Project.

49.     By executing the Ground Lease and Operating Agreement containing these requirements, the federal government clearly and unambiguously authorized South Carolina to enforce its State and local building codes and housing laws as they relate to the safety and habitability of housing.  Moreover, the federal government has not exercised its jurisdiction as to landlord-tenant laws

at Fort Jackson (and other MHPI projects) because there is no federal common law that addresses these principles.

**C.    False and Misleading Marketing and Promotions**

50.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

51.    Defendants negligently misled military housing tenants and their families, including Plaintiffs, by marketing and promoting their residential properties as safe, habitable and fit to live in.  Defendants failed to account for and report the true condition of the leased properties which, more often than not, contain serious defects.

52.    For example, Balfour's website describes their military houses as award-winning and includes photos depicting an upscale neighborhood with modern looking houses and amenities.[1]



53.    The "Amenities" subpage on Defendant's website contains photos which are reminiscent of a private country club with top-notch amenities, tennis courts, and newly constructed family housing. In reality, most houses at Fort Jackson are polluted and deficient in

---

[1] https://tc.atlanticmcc.com/

many regards. As evidence shows, Plaintiffs' rental house at #5806A Burt Road was contaminated with raw sewage.

54.    On October 14, 2016, the Office of Inspector General ("OIG") issued a report to "summarize and analyze previous … health and safety inspections of DoD-occupied facilities and military housing."[2] One "objective was to identify common issues and broader findings." The OIG findings included: "Deficiencies in electrical system safety, fire protection systems, and environmental health and safety were pervasive because of a lack of adequate preventative maintenance and inspections being performed at the installations. As a result, DoD personnel and military families were exposed to health and safety hazards at installations around the world."[3] "These systemic problems resulted in increased health and safety risks to service members."[4] The OIG summarized prior reports finding "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."[5]

55.    In 2019, the Reuters news agency published award-winning[6] investigative reporting on the deteriorated condition of military housing. This prompted Congress to conduct

---

[2] Summary Report - Inspections of DoD Facilities and Military Housing and Audits of Base Operations and Support Services Contracts, Department of Defense Office of Inspector General, DODIG-2017-004, October 14, 2016. ("2016 OIG Report").

[3] *Id.*

[4] *Id.*

[5] 2016 OIG Report, findings, p. 6. It noted that "[i]n addition to the critical mold-related deficiencies in Report No. DODIG-2014-121, we also documented mold-related problems in all three of the reports that included environmental health and safety inspections (Report Nos. DODIG-2015-013, DODIG-2015-162, and DODIG-2015-181)." *Id.* Of those reports, DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, surveyed three installations in the Southeastern region of the continental United States—Patrick Air Force Base (AFB), Naval Station (NS) Mayport, and Fort Gordon. DODIG-2015-162, Continental United States Military Housing Inspections – National Capital Region, surveyed two installations in the United States National Capital Region—Fort Belvoir and Joint Base Anacostia-Bolling.

[6] Reuters series 'Ambushed at Home' wins National Press Club Award, July 26, 2019, available at https://www.reuters.com/article/rbp-npc2019/reuters-series-ambushed-at-home-wins-national-press-club-award-idUSKCN1UL20M.

multiple hearings where elected representatives and the public heard testimony from military family members who bravely went public despite threats of intimidation and retaliation. They provided graphic and disturbing testimony about mold exposure, pest infestations, water intrusion, rude and dismissive house management, and ineffective oversight.

56.    In March 2020, Elizabeth Field, a Defense Capabilities and Management Director with the GAO, stated that when her group investigated tenant complaints as to privatized military housing, "we really found problems related to privatized housing at every location that we visited."

57.    Despite the foregoing, Defendants negligently continued to advertise and promote a starkly inaccurate portrayal of leased military houses on their website.

58.    Upon information and belief, Defendants received hundreds or thousands of complaints from tenants about the condition of housing at Fort Jackson, including many long before Plaintiffs moved into #5806A Burt Road.  Defendants knew, or should have known, that defects in the housing including, but not limited to, housing defects posed a physical threat to military tenants and their families.

59.    For example, on March 1, 2019, Fort Jackson leaders hosted a town hall meeting on the base.  Complaints from tenants included mold and *sewage* problems as well as work orders that were never completed or resolved.[7]  According to base commanders, the housing managers "dropped the ball" and "we've lost sight of the goalpost".[8]

**D.    Form Leases at Fort Jackson**

60.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

---

[7] https://www.wistv.com/2019/03/18/weve-dropped-ball-fort-jackson-leadership-says-it-works-improve-on-post-housing/
[8] *Id.*

- 14 -

61.    Plaintiff Travis Wilson executed a form lease ("Lease") for #5806A Burt Road on December 21, 2022.  The initial one-year Lease term commenced on December 22, 2022, and ended on December 22, 2023.  The Lease names Fort Jackson Housing as the "Owner" and Balfour as the property manager or "Agent" authorized to act on Fort Jackson Housing's behalf.  The Lease also describes Fort Jackson Housing as the "Landlord" and Balfour as the "Landlord Representative".

62.    The Lease stated that Fort Jackson Housing, as the owner, was "responsible for maintenance and repair of the Premises", and for ensuring that the Premises are safe and habitable. The Lease incorporated by reference a document called "Community Guidelines" that specifies Balfour's maintenance responsibilities and states, "Landlord is generally responsible for the maintenance of the Premises."

63.    Plaintiffs' lease prohibits residents from taking many self-help measures.  For example, except for an emergency, the Lease prohibits Plaintiffs from making repairs, alterations or improvements without Defendants' prior consent including small items such as paint, wallpaper, changing locks, using screws, fastening devices, large nails, or adhesive materials.  In this respect, Defendants maintained possession and control of the leased premises.

64.    The Community Guidelines document promised that Fort Jackson Housing would provide quality of life for service members and their families, assume responsibility for the military family Resident's housing and that Balfour's staff would assist residents in every possible way to ensure superior quality housing services and amenities.

65.    The foregoing terms represented a binding agreement whereby Defendants undertook the duty to make repairs at #5806A Burt Road and to keep the home safe and habitable.

Moreover, these same written terms formed an express warranty that Defendants would maintain the leased premises in a safe and habitable condition.

66.     According to Section "K", the Lease was governed by the prevailing laws of the State in which the Premises was located, i.e., South Carolina, including "any applicable ordinances; all applicable federal statutes and regulations; and any applicable military rules, instructions and/or guidelines."  Further, the Lease states, all "applicable State Landlord-Tenant law of [South Carolina] and the State Common law interpreting such Landlord-Tenant law, shall apply."

67.     Pursuant to the choice-of-law provision contained in Defendants' lease, the applicable law includes the South Carolina Residential Landlord and Tenant Act ("SCRLTA") and South Carolina state common law that interprets the SCRTLA.

68.     In South Carolina, the SCRLTA gives rise to a cause of action in tort.

69.     The plain meaning of the Ground Lease, Operating Agreement(s), residential lease agreement and community guidelines is the state and local laws apply to *all* of Plaintiffs' claims. In these regards, Defendants represented to Plaintiffs that their lease agreement conferred or involved rights, remedies, or obligations.

70.     According to SCRLTA, S.C. Code Ann. §27-40-330, a residential lease agreement cannot make a tenant give up any legal rights or remedies under the South Carolina Landlord and Tenant Act or limit the landlord's liability when he or she has failed in his or her duties.

71.     As such, any language in the Lease that seeks to limit or eliminate Plaintiffs' rights and remedies under SCRLTA is void and unenforceable.

72.     Under the Lease terms and the SCRLTA, Defendants owed a duty to Plaintiffs to provide safe and habitable residential housing. Specifically, South Carolina Code of Laws §27-40-

220 imposes upon landlords an obligation of good faith in the performance of their obligations under residential leases.

73. Based on the plain language in the Lease and its incorporation of SCRLTA, the parties intended that South Carolina law would apply to Plaintiffs' claims. There are no circumstances indicating a different intention.

74. On March 10, 2021, a joint hearing on privatized military housing was held before a subcommittee in the United States House of Representatives. Rick Taylor, President of Facility Operations, Renovations and Construction for Balfour, testified at the hearing. When Congresswoman Jackie Speier asked, "Do each of you recognize your responsibility to comply with state and local laws concerning habitability of housing", Mr. Taylor acknowledged Balfour's duty to comply.[9]

75. Despite Mr. Taylor's admission that state and local housing laws apply, Defendants (and other privatized housing companies) have repeatedly argued in Court, and continue to argue, that modern landlord and tenant laws concerning the habitability of housing, including the SCRLTA, do not apply to claims brought in tort by our nation's military heroes and their families. Instead, Defendants argue that such claims are barred or severely limited by the Federal Enclave Doctrine.

76. Mr. Taylor's testimony to Congress, along with the express language of the Ground Lease and residential Leases, shows that it was the parties' intent that state and local housing laws concerning the habitability of housing apply to Plaintiffs' claims.

---

[9] See https://www.youtube.com/watch?v=VcBVr5pzZHU at time signature 46:10.

77.    All notifications, statements, and representations made by Defendant Balfour to Plaintiffs were made under the within the course and scope of Defendant Balfour's agency with Defendant Fort Jackson Housing.

78.    Defendant Balfour drafts and controls the Community Policies and Guidelines provided to Fort Jackson residents and controls and directs virtually all representations to military families at Fort Jackson.

79.    Defendants had a pecuniary interest in leasing military housing to Plaintiffs at #5806A Burt Road.

80.    Plaintiffs would not have entered into the Lease had Defendants disclosed material information about possible safety and health hazards at #5806A Burt Road that Defendants knew or should have known.

**E.  The Wilson Family**

81.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

82.    After initially enlisting in the U.S. Army, Travis Wilson was commissioned as an officer into the Chaplain's Corps. Simultaneously, he earned a bachelor's degree in multidisciplinary studies followed by a master's degree in divinity. Jaclyn Wilson has a bachelor's degree in Elementary Education and a Masters in Marriage and Family Counseling. Travis Wilson and Jaclyn Wilson married on May 30, 2008.

83.    The Wilson family includes *six* children. Prior to moving into #5806A Burt Road, M.W. had no major health problems or skin rashes.

84.    Prior to moving in, no significant deficiencies in the house were observed by Plaintiffs or reported by Defendants.  Plaintiffs were not warned or advised of any present or past

history of mold or raw sewage in the home.  Instead, Defendants warranted and represented to Plaintiffs that #5806A Burt Road was safe and habitable.

85.    Plaintiffs relied on Defendants' representations as a basis for leasing the home.

86.    In view of the various reports, studies and documents in their possession, Defendants had longstanding knowledge of moisture-related defects in housing at Fort Jackson and negligently failed to warn Plaintiffs.  Upon information and belief, Defendants had prior knowledge of sewage problems at #5806A Burt Road but did not advise Plaintiffs.

87.    According to Balfour, #5806A Burt Road was the only available home for rent. Prior to moving in on December 22, 2022, the Wilsons were given the 7-Year maintenance history which, in hindsight, was not remotely accurate or a fair representation of the home's true condition.

88.    Evidence will show that previous tenants reported defects that were not included in the maintenance history report. Specifically, 5806 Burt had a sewage backflow problem. The previous tenants spoke to the Wilsons and experienced the same issues.

89.    Plaintiffs moved to #5806A Burt Road on December 22, 2022.  Almost immediately, a toilet in the upstairs bathroom upstairs toilet overflowed. Jaclyn Wilson reported the problem to Balfour and maintenance workers responded.  To Wilson's dismay, the workers simply locked the door to the bathroom and said they would return later. Apparently, the workers were overwhelmed with other maintenance calls and did not return.

90.    The Sewage overflow leaked through the ceiling and into the kitchen below. The smell in the house was horrific. Eventually, the workers returned and falsely reported that the problem was fixed.

91.    In early March 2023, sewage again overflowed from the toilet and leaked through the ceiling into the kitchen. Jaclyn Wilson immediately reported this to Balfour and workers

responded. However, instead of fixing the problem, they removed the toilet and put it in the adjacent tub for weeks. The workers didn't return for nearly a month. This caused the sewer pipe in the bathroom to remain open and exposed. It was filthy, unsanitary and posed serious health risks to the family, including M.W. Eventually, the entire family was temporarily displaced to a hotel due to the sewage leak.

92.    When the family returned home, the toilet remained sitting in the adjacent bathtub and the sewer pipe was still open and exposed.



93.    All sewage contains harmful bacteria. At the time, M.W. was four years old and played on the floors in the home. M.W. was exposed to harmful bacteria that had overflowed from the open sewer pipe and leaked into the home.

94.    In early March 2023 (i.e., when the second sewage overflow occurred), Jaclyn Wilson noticed that M.W. had become very tired and lethargic. The family traveled to visit relatives in Florida then returned home to Fort Jackson. By that point, Marcus's face was drooping on one side and Jaclyn Wilson took him to the emergency room. As Jaclyn and Travis would later learn, M.W. had a rare bacterial infection affecting his brain.

95.    Initially, the emergency room doctors ordered a CT scan which ruled out a stroke. But the doctors remained very concerned and transferred M.W. to a hospital in Birmingham, Alabama. As to the scan results, Jaclyn recalls the doctors saying, "[t]here is something showing in the scan, and you need to leave for Birmingham *now*." Jaclyn left the other children behind with her mother and felt bewildered because she had never left them before.

96.    M.W. was admitted to the hospital in Birmingham and an MRI quickly followed. Approximately *eight* neurologists evaluated M.W. One of the doctors observed signs of "acute disseminated encephalitis" ("ADEM") which is a rare inflammatory disease that affects the brain and spinal cord. According to the doctors, it primarily occurs in children following bacterial infections.

97.    ADEM is very rare but extremely dangerous. It affects the neurons in the brain and spinal cord which are insulated by a substance called myelin. With ADEM, the immune system mistakenly targets the myelin leading to inflammation and brain damage. Symptoms can be varied because the condition can affect various parts of the nervous system. Common symptoms include onset of fever, fatigue, headache, nausea, vomiting, and in severe cases, seizures and loss of consciousness. ADEM can also harm motor skills and cause difficulty with coordination, speech and vision. Unfortunately, M.W. was diagnosed with ADEM following his exposure to raw sewage at 5806 Burt Road and continues to struggle with many symptoms.



98.     Plaintiffs submitted multiple work orders related to the defective sewage drainage, but Defendants negligently failed to repair and/or replace the system as the Lease required.

99.     By negligently removing the toilet from its fixture and leaving the sewage drainage pipe open and exposed, Defendants made the dangerous defect worse.

100.    In this respect, Defendants were on notice that serious sewage draining problem existed at #5806A Burt Road.

101.    Defendants knew, or should have known, that the defective sewage drainage system was causing filth and bacteria to accumulate in the home which posed a potential health hazard to the occupants.

102.    Defendants' previous knowledge of sewage drainage problems defects in other homes at Fort Jackson of similar construction and age, and that such homes including #5806A Burt Road were prone to the accumulation of potentially toxic sewage which posed a danger to occupants.  Nevertheless, Defendants actions did not cure the known defects.

103.    In the aforementioned regards, Defendants undertook to make the repairs as they repeatedly promised to do while Plaintiffs were tenants and injuries occurred on account of their negligence in so doing.

104.    Defendants negligently failed to follow industry standards for plumbing repair. Rather than hiring competent and licensed repair personnel, Defendants conducted hodge-podge repairs and negligently advised Plaintiffs that the home was safe and habitable.    In essence, Defendants made the problem worse by failing to make proper repairs and advising the parents that it was safe for M.W. to remain living there.

105.    Evidence shows that as a result of Defendant's negligent failure to maintain #5806A Burt Road, M.W. was exposed to toxic sewage overflow which caused and/or exacerbated ADEM, severe physical pain, hospitalization, emotional harm and other damages to be shown at trial.

106.    Throughout all of this, Plaintiffs, Jaclyn Wilson and Travis Wilson, witnessed their young son suffer severe and painful personal injuries from exposure to toxic sewage at #5806A Burt Road.  As a direct and proximate result, Jaclyn Wilson and Travis Wilson suffered severe emotional distress which manifested itself in physical symptoms including, but not limited to, physical pain, extreme worry and anxiety, depression, loss of sleep, and other particulars to be shown at trial.

### <u>FIRST CAUSE OF ACTION—NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS, WILFUL & WANTON CONDUCT [10]</u>
**(All Defendants)**

107.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

108.    28 U.S.C. §5001(a) provides, "In the case of the death of an individual by the neglect or wrongful act of another in a place subject to the exclusive jurisdiction of the United States within a State, a right of action shall exist as though the place were under the jurisdiction of

---

[10] The First cause of action, Negligence, is brought by Jaclyn Wilson, as mother and next friend of M.W. a minor, Jaclyn Wilson, individually, and Travis Wilson individually.

the State in which the place is located." Subsection (b) states, "[i]n a civil action brought to recover on account of an injury sustained in a place described in subsection (a), the rights of the parties shall be governed by the law of the State in which the place is located."

109.    By the express terms of the Lease, Defendants maintained the management and control over repairs at #5806A Burt Road.  Because possession and control over repairs are reserved to Defendants, South Carolina law implies an obligation, creates a legal duty, to keep the leased premises in repair and operating properly.

110.    Even in the absence of the Lease, Defendants duty to Plaintiffs existed independently based on the long-standing common law duty to exercise due care to foreseeable Plaintiffs.

111.    Defendants owed duties to Plaintiffs as follows:

   a.   To maintain the leased premises at #5806A Burt Road in good repair and operating properly;

   b.   To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

   c.   To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

   d.   To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

   e.   To ensure that Plaintiffs had quality housing generally reflecting contemporary community living standards;

f.  To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

g.  To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

h.  To keep the leased premises clean, safe, and habitable;

i.  To adhere to the terms of the Ground Lease;

j.  To adhere to the terms of the Lease;

k.  To comply with applicable federal, state, and local laws regarding the safety and habitability of the leased premises including, without limitation, the SCRLTA;

l.  To comply with the International Property Maintenance Code, as adopted by the City of Columbia, South Carolina;

m. To exercise reasonable care for the safety of Plaintiffs and M.W.;

n.  To comply with their safety plans, safety protocols, and safety procedures that required putting residents on notice of potentially harmful conditions and related health risks they may encounter at #5806A Burt Road;

o.  To communicate truthful information to residents about the homes in Fort Jackson, including #5806A Burt Road, including a duty to disclose material facts regarding the premises of which Defendants had knowledge, as to which Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into the Leases, and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading;

p.  To properly complete repairs to the plumbing system and related moisture intrusion at #5806A Burt Road as required by the lease and once undertaken by Defendants;

112.    Defendants breached their duties to Plaintiffs in one or more of the following particulars:

a.  By negligently, recklessly, and willfully and wantonly failing to comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

b.  By negligently, recklessly, and willfully and wantonly failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

c.  By negligently, recklessly, and willfully and wantonly failing to refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

d.  By negligently, recklessly, and willfully and wantonly failing to ensure that Plaintiffs had quality housing generally reflecting contemporary community living standards;

e.  By negligently, recklessly, and willfully and wantonly failing to undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

f.  By negligently, recklessly, and willfully and wantonly failing to refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

g.  By negligently, recklessly, and willfully and wantonly failing to keep the leased premises clean, safe, and habitable;

h.  By negligently, recklessly, and willfully and wantonly failing to adhere to the terms of the Ground Lease;

i.  By negligently, recklessly, and willfully and wantonly failing to adhere to the terms of the Lease;

j.  By negligently, recklessly, and willfully and wantonly failing to comply with applicable federal, state, and local laws regarding the safety and habitability of the leased premises including, without limitation, the SCRLTA;

k.  By negligently, recklessly, and willfully and wantonly failing to comply with the International Property Maintenance Code, as adopted by the City of Columbia, South Carolina;

l.  By negligently, recklessly, and willfully and wantonly failing to exercise reasonable care for the safety of M.W.;

m.  By negligently, recklessly, and willfully and wantonly failing to comply with their safety plans, safety protocols, and safety procedures that required putting residents on notice of potentially harmful conditions and related health risks they may encounter at #5806A Burt Road;

n.  By negligently, recklessly, and willfully and wantonly failing to communicate truthful information to residents about the homes in Fort Jackson, including #5806A Burt Road, including a duty to disclose material facts regarding the premises of which Defendants had knowledge, as to which Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering

into the Leases, and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading;

o. By negligently, recklessly, and willfully and wantonly covenanting to keep the premises safe and habitable during the lease term and failing to do so;

p. By undertaking to make needed repairs negligently, recklessly, and willfully and wantonly, including repairs to the plumbing at #5806A Burt Road;

q. In other respects to be shown at trial.

113.    Defendants' breaches of duties as aforesaid constitute negligence, negligence *per se*, recklessness, gross negligence, and willful and wanton disregard for the health and safety of the Plaintiffs.

114.    As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, gross negligence, and willful and wanton disregard for the health and safety of the Plaintiffs, Plaintiffs incurred actual damages in the form of physical injuries including, but not limited to, ADEM, physical injuries, physical pain, severe emotional distress and mental anguish, and other special damages in an amount to be proven at trial.

115.    As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, gross negligence, and willful and wanton disregard for the health and safety of Plaintiffs, Plaintiffs are entitled to an award of all his actual and consequential damages, in amounts to be proven at time of trial.

116.    Plaintiffs, Travis Wilson and Jaclyn Wilson, individually, are entitled to recover economic losses to include lost income and out-of-pocket medical expenses for M.W., in an amount to be determined at trial, as well as other damages allowed under South Carolina law.

117.    Defendants' conduct was undertaken grossly negligently and with reckless and

willful and wanton disregard for the foreseeable consequences to Plaintiffs.

118.    Defendants' conduct therefore justifies an award of exemplary or punitive damages.

### SECOND CAUSE OF ACTION- OUTRAGE[11]
### (All Defendants)

119.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

120.    28 U.S.C. §5001(a) provides, "In the case of the death of an individual by the neglect or wrongful act of another in a place subject to the exclusive jurisdiction of the United States within a State, a right of action shall exist as though the place were under the jurisdiction of the State in which the place is located." Subsection (b) states, "[i]n a civil action brought to recover on account of an injury sustained in a place described in subsection (a), the rights of the parties shall be governed by the law of the State in which the place is located."

121.    Defendants intentionally inflicted severe emotional distress, or were certain, or substantially certain, that such distress would result from their conduct.

122.    Defendants' conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community.

123.    The actions of Defendants caused all Plaintiffs severe emotional distress such that no reasonable person could be expected to endure it.

124.    In view of the foregoing, Plaintiffs are entitled to an award of consequential damages, in amounts to be proven at time of trial.

### THIRD CAUSE OF ACTION-NEGLIGENT INFLICTION OF EMOTIONAL

---

[11] The Second cause of action, Reckless Infliction of Emotional Distress (Outrage) is brought by all Plaintiffs.

### DISTRESS[12]
### (All Defendants)

125.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

126.    28 U.S.C. §5001(a) provides, "In the case of the death of an individual by the neglect or wrongful act of another in a place subject to the exclusive jurisdiction of the United States within a State, a right of action shall exist as though the place were under the jurisdiction of the State in which the place is located." Subsection (b) states, "[i]n a civil action brought to recover on account of an injury sustained in a place described in subsection (a), the rights of the parties shall be governed by the law of the State in which the place is located."

127.    As detailed herein above, the negligence of Defendants caused serious physical injury to M.W., a minor child.

128.    As the parents of M.W., Plaintiffs Jaclyn Wilson and Travis Wilson were in close proximity at all times herein and contemporaneously perceived the severe injuries to M.W. Plaintiffs witnessed their son's severe agony which, due to Defendants' negligence, persisted for months and/or years.  At times, Plaintiffs perceived that their son's life was in danger from the severe injuries which he sustained at #5806A Burt Road.

129.    As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, gross negligence, and willful and wanton disregard for Plaintiffs' health and safety,, Plaintiffs, as bystanders, suffered severe emotional distress which manifested itself by physical symptoms including, but not limited to, physical pain, physical injuries, extreme worry and anxiety, depression, loss of sleep, stomach pain and other particulars to be shown at trial.

---

[12] The Third cause of action, Negligent Infliction of Emotional Distress, is brought by Jaclyn Wilson and Travis Wilson, individually.

130.     Plaintiffs are entitled to an award of all their actual and consequential damages, in amounts to be proven at time of trial.

## FOURTH CAUSE OF ACTION-VIOLATION OF SOUTH CAROLINA RESIDENTIAL LANDLORD TENANT ACT[13]
### (All Defendants)

131.     Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

132.     28 U.S.C. §5001(a) provides, "In the case of the death of an individual by the neglect or wrongful act of another in a place subject to the exclusive jurisdiction of the United States within a State, a right of action shall exist as though the place were under the jurisdiction of the State in which the place is located." Subsection (b) states, "[i]n a civil action brought to recover on account of an injury sustained in a place described in subsection (a), the rights of the parties shall be governed by the law of the State in which the place is located."

133.     The Lease incorporates by reference the terms of the SCRLTA.

134.     Under the Lease and the SCRLTA, Defendants owe a duty to Plaintiff to provide safe and habitable residential housing.

135.     Specifically, South Carolina Code of Laws §27-40-220 imposes upon landlords an obligation of good faith in the performance of their obligations under residential leases.

136.     Also, South Carolina Code of Laws §27-40-440(a) obligates Defendants to supply housing that complies with all applicable building and housing laws materially affecting health and safety and to keep the Premises in a fit and habitable condition.

137.     The SCRLTA was enacted to provide for safe and habitable housing, including

---

[13] The Fourth Cause of Action, violation of SCRLTA, is brought by all Plaintiffs.

compliance with the requirements applicable building and housing codes materially affecting health and safety, and to promote public safety.

138.    Defendants have mandatory statutory duties to tenants under SCRLTA to do whatever is necessary to put and keep and do whatever is necessary to put and keep the premises in a fit and habitable condition.

139.    Plaintiffs are tenants in leased houses subject to the provisions of SCRLTA, and a within the class of persons to be protected by application of SCRTLA.

140.    The SCRLTA explicitly creates an action in tort for Defendants' failure to repair a leased premises after having notice of a defect.

141.    Under the terms of the Residential Leases, Plaintiffs agreed to pay rent in exchange for safe and habitable residential housing.

142.    Defendants breached their duty to provide safe and habitable residential housing.

143.    Despite their mandatory duties per the Residential Leases and the SCRLTA, Defendants failed to provide healthy, safe, fit, and habitable housing to Plaintiffs. Instead, Defendants exposed Plaintiffs to known plumbing defects, sewage contamination and related health risks without their knowledge and against their will.

144.    Defendants therefore breached their duties under the Leases and the SCRLTA and Plaintiffs are entitled to all rights and remedies afforded to tenants under the SCRLTA, which includes a recovery for their reasonable attorney's fees and costs.

145.    Because of Defendants' breaches of their duties under the Residential Leases and the SCRLTA, it has been necessary for Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

146.    Plaintiff Travis Wilson has sustained damages as a result of Defendants'

breaches of their duties under the Lease and the SCRLTA, which damages include the overpayment of rent.

147.    M.W., a minor, sustained damages as a result of Defendants' breaches of their duties under the Lease and the SCRLTA, which damages include severe personal injury, pain & suffering, emotional distress and other damages to M.W. as fully detailed herein above.

148.    Plaintiffs, Travis Wilson and Jaclyn Wilson, individually, are entitled to recover economic losses to include lost income and out-of-pocket medical expenses for M.W., in an amount to be determined at trial, as well as other damages allowed under South Carolina law.

149.    As a proximate and legal result of Defendants' breaches of their duties, Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

### FIFTH CAUSE OF ACTION-VIOLATION OF S.C. CODE § 39-5-20 (UNFAIR AND DECEPTIVE TRADE PRACTICES[14]
### (All Defendants)

150.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

151.    In South Carolina, an action for damages may be brought under the South Carolina Unfair Trade Practices Act ("SCUTPA") for "unfair methods of competition and unfair or deceptive acts or practices" in the conduct of trade or commerce." *S.C. Code Ann. §39-5-20(a) (1985).*

152.    "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method,

---

[14] The Fifth Cause of Action, Unfair and Deceptive Trade Practices, is brought by Plaintiff Travis Wilson, individually.

act or practice declared unlawful by §39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages." *S.C. Code Ann. § 39-5-140(a) (1985).*

153.    S.C. Code Ann. § 39-5-10(b) (1985 Supp. 1996) sets forth a broad definition of "trade and commerce" to include the "sale or distribution" of any "thing of value" directly or indirectly affecting South Carolina's citizens. Leases, while created by contract, grant the tenant the right to use and enjoy property. They clearly are a "thing of value," even under the strictest reading of the statute's plain language.

154.    Defendants' conduct as detailed above has an impact upon the public interest and has the potential for repetition.  The problems experienced by Plaintiff are not isolated events. Defendants have been sued in multiple jurisdictions for similar unfair and deceptive trade practices.  Recently, Defendants' prior military housing tenants were awarded damages due to Defendants' unfair and deceptive practices.[15]

155.    Defendants violated SCUTPA in multiple respects, including without limitation: (i) violating SCRLTA, (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

A.    Falsely representing, both prior to and during the lease period, that the leased property was safe, habitable and fit for Plaintiffs to live in;

B.    Knowingly making false or misleading statements of fact concerning the condition of the leased premises both prior to and during the lease period;

---

[15] https://www.fox44news.com/business/press-releases/cision/20240703DA54361/guerra-llp-army-family-awarded-10-3-million-over-toxic-fort-cavazos-housing/ .

C.  Falsely representing, both prior to and during the lease period, which work, or services had been performed on the leased premises in a manner that made it safe and habitable for Plaintiffs to live in;

D.  Failing to disclose information concerning the leased premises which was known at the commencement of the lease which was intended to induce Plaintiffs into a lease agreement which Plaintiffs would not have entered into had the information been disclosed;

E.  Representing to Plaintiffs that their lease agreement conferred or involved rights, remedies, or obligations which, now, Defendants argue that it did not;

F.  In other particulars to be shown at trial.

156.    In view of the foregoing, Plaintiffs are entitled to attorney's fees, costs and treble damages.

### SIXTH CAUSE OF ACTION-NEGLIGENT MISREPRESENTATION[16]
### (All Defendants)

157.    Plaintiffs reiterate and reallege the previous paragraphs as if fully set forth herein.

158.    As described herein above, Defendants falsely represented to Plaintiffs that the rental home at #5806A Burt Road was safe, habitable and fit to live in.

159.    Defendants had a pecuniary interest in making false representations.  Specifically, Defendants made false statements to induce Plaintiffs into a lease agreement whereby they would pay monthly rent in the form of BAH.

---

[16] The Sixth Cause of Action, Negligent Misrepresentation, is brought by Plaintiffs Travis Wilson, Individually, and Jaclyn Wilson, individually.

160.    Defendants had a duty to communicate truthful information to Plaintiffs concerning the safety and habitability of its leased military housing at #5806A Burt Road.  Defendants breached their duty by failing to exercise due care.

161.    Plaintiffs justifiably relied on Defendants' false representations and entered into lease agreements which Plaintiffs would not have entered into had truthful and complete information been disclosed.

162.    Plaintiffs justifiably relied on Defendants' false representations and resided at #5806A Burt Road where Plaintiffs would not have resided had truthful and complete information been disclosed.

163.    As a proximate result of his reliance on Defendants' false representations, Plaintiffs suffered pecuniary losses in the form of overpayment of rent, property damage, property loss, and other financial losses to be shown at trial.

### SEVENTH CAUSE OF ACTION-FRAUDULENT  INDUCEMENT[17]
### (All Defendants)

164.    Plaintiffs reiterate and reallege the previous paragraphs as if fully set forth herein.

165.    Defendants' representations to Plaintiffs that #5806A Burt Road as safe, habitable, and fit to live in were false and made to induce Plaintiffs to sign a lease and pay rent.

166.    Defendants made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of Plaintiffs' house. Defendants also made material representations that repair work would be complete and/or had been completed, and that as a result, Plaintiff's house had become habitable, and the problems resolved.

---

[17] The Seventh Cause of Action, Fraud in The Inducement, is brought by Plaintiffs Travis Wilson, Individually, and Jaclyn Wilson, individually.

167.    Defendants were aware that all of their omissions of fact concerning the condition of the house were material when the presented Plaintiff, Travis Wilson, with leases, and Defendants—because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting—knew their representations regarding the habitability of the houses were false and/or misleading.

168.    Despite knowing the falsity, Defendants made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

169.    Defendants' representations were made to induce continuing rent payment from Plaintiffs.

170.    Plaintiffs were ignorant of the falsity of Defendants' representations. As lay renters limited in their ability to self-help, Plaintiffs had a right to rely on Defendants' representations that the property was safe and habitable despite latent plumbing and sewage – all conditions which are not reasonably ascertainable to renters such as the Plaintiffs.

171.    Without knowing Defendants' representations were false, Plaintiffs reasonably and materially relied on the statements in allowing their family to remain living at #5806A Burt Road and making continued rent payments.

172.    As a direct and proximate result of Defendants' false statements, Plaintiffs incurred actual damages including the overpayment of rent, property damage, property loss, property replacement, and other losses to be shown at trial. Additionally, Plaintiffs have been forced to retain counsel and incur attorney's fees and costs.

173.    As a result, Plaintiffs are entitled to an award of damages against Defendants for the losses described and to pre-judgment interest at the statutory rate.

174.    Defendants' actions were reckless and willful and justify an award of punitive damages.

## EIGHTH CAUSE OF ACTION-BREACH OF CONTRACT[18]
### (All Defendants)

175.    Plaintiffs reiterate and reallege the previous paragraphs as if fully set forth herein.

176.    Plaintiff entered a valid contract in the form of a residential lease with Defendant.

177.    Under the Lease, Defendants assumed responsibility to meet the housing needs of Plaintiff; this included a duty to disclose the existence of defective plumbing and/or environmental contamination and potential health hazards of which Defendants had actual or constructive knowledge and duties under the South Carolina Residential Landlord Tenant Act (S.C. Code Ann. §§27-40-10 through 27-40-940) (the "SCRLTA") to "make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition," to "keep all common areas of the premises in a reasonably safe condition," and to "maintain in reasonably good and safe working order and condition all electrical, gas, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by" Defendants.

178.    Under the terms of the Lease, Plaintiff agreed to pay rent  equal to his BAH in exchange for safe and healthy residential housing for their families and agreed the parties' respective lease obligations and responsibilities would be construed under the SCRLTA and South Carolina common law interpreting these sections.

179.    Under the terms of the Lease and applicable laws, Defendants breached the Lease with Plaintiff.

---

[18] The Eighth Cause of Action, Breach of Contract, is brought by Plaintiff Travis Wilson, individually.

180.    Specifically, Defendants failed to:

   a.  Disclose to Plaintiff the nature and extent of environmental hazards identified in Defendant's Environmental Site Assessment and the Government's Environmental Baseline Survey;

   b.  Warn Plaintiff about hidden defects on the Premises that could substantially interfere with safe enjoyment and use of the Premises;

   c.  Comply with applicable provisions of internal policies and procedures regarding safety and habitability of housing at Fort Jackson;

   d.  Comply with applicable provisions of federal, state, and local laws that established a standard of care with respect to safety and habitability of housing at Fort Jackson (as set forth further herein);

   e.  Comply with the express terms of the Lease which require Defendants to make proper repairs to the premises;

   f.  Comply with the terms and requirements of the Community Guidelines which require Defendant to provide safe and habitable housing;

   g.  Comply with applicable provisions of the SCRLTA; and

   h.  Provide safe and habitable housing to Plaintiff;

   i.  Other breaches to be shown in Court.

181.    Plaintiff sustained damages as a result of Defendants' breaches including the overpayment of rent property damage, property loss and other damages to be shown at trial.

182.    Because of Defendants' breaches of contract, it has been necessary for Plaintiff to incur expenses and other special damages in an amount to be proven at trial.

183.    Under the terms of the Lease, Plaintiff is entitled as the prevailing party to

recover reasonable attorneys' fees and costs in pursuing this action.

184.    As a proximate and legal result of Defendants' breaches of contract, Plaintiff is entitled to an award of all his actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

## NINTH CAUSE OF ACTION-DECLARATORY JUDGMENT (Non-Jury)

185.    Plaintiffs reiterate and reallege the previous paragraphs as if fully set forth herein.

186.    This claim is brought under the provisions of the Federal Declaratory Judgment Act, 28 U.S.C. §2201 et seq. and Rule 57, Fed. R. Civ. P.; there is a real and justiciable controversy between the parties, by these proceedings Plaintiffs ask the Court to inquire into and declare the rights and obligations of the parties hereto arising out of the facts set forth herein above.

187.    Under the federal-enclave doctrine, when "the United States acquires with the consent of the state legislature land within the borders of that State[,] . . . the jurisdiction of the Federal Government becomes exclusive." *Paul v. United States*, 371 U.S. 245, 264 (1963) (internal quotations omitted).  On such "federal enclaves," only state-law claims recognized at the time of the federal acquisition are cognizable. See id. at 268. Therefore, "when an area in a State becomes a federal enclave, only the state law in effect at the time of the transfer of jurisdiction continues in force," and "[g]oing forward, state law presumptively does not apply to the enclave." *Parker Drilling Mgmt. Servs. Ltd. v. Newton*, 587 U.S. 601, 602-03 (2019) (emphasis added); *see Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 218 (4th Cir. 2022) ("The federal government thus possesses 'sole jurisdiction' over its enclaves.").

188.    "[T]he activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides `clear and unambiguous' authorization for

such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 172, 180 (1988) (*quoting EPA v. State Water Resources Control Board*, 426 U.S. 200, 211 (1976)). The Federal Enclave Doctrine applies to land held by the federal government that was given, deeded or ceded by the state. *Id*. A state law will apply to the federally held land if either the state law existed at the time of cession and has not been abrogated by Congress, a relevant predecessor state law existed, or Congress has specifically acted to make state law applicable on the enclave." *Kelly v. Lockheed Martin Services Gr*., 25 F. Supp. 2d 1, 6 (D.P.R. 1998).

189.    In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"), Defense Authorization Act, P.L. 104-106, 110 Stat. 186. The Privatization Initiative is a public/private program that, among other things, seeks "to stimulate private sector financing of military housing construction and revitalization projects," S. Rep. No. 104-112, §§ 2811 pp. 329 (1995), and "substantially upgrade military housing on an accelerated basis." MHPI is a program that allows the Department of Defense ("DoD") to lease military land to private companies to build, maintain, and upgrade housing for service members and their families.

190.    The DoD has issued policy guidance to ensure that MHPI housing projects provide safe and quality housing for tenants. Tenants have rights such as access to an electronic work order system, prompt maintenance and repairs, and the right to receive military legal assistance.

191.    The MHPI is codified in Title 10 of the United States Code, Sections 2871-2894(a).

192.    10 U.S.C. §2890 provides for the rights and responsibilities of tenants in privatized military housing units and requires the Secretary of Defense to develop and implement the "Military Housing Privatization Initiative Tenant Bill of Rights" which must be attached to

each lease agreement for a military housing unit.

193.    According to the Tenant Bill of Rights, tenants have the "right to expect common documents, forms and processes for housing units will be the same for all installations of the Department, to the maximum extent applicable without violating local, State and Federal regulations." 10 U.S.C. §2890(b)(18)

194.    To that same end, Pub. L. 116–92, div. B, title XXX, §3057, Dec. 20, 2019, 133 Stat. 1945, provides for a universal lease agreement for privatized military housing that includes "any addendum required by the law of the State in which the unit of privatized military housing is located."

195.    10 U.S.C. §2890a codifies requirements relating to management of military housing units. According to subsection (d), a landlord must remediate any issues and make any appropriate repairs so that the housing unit meets minimum "health, safety, and welfare standards set forth in Federal, State, and local law [ ]."

196.    The aforementioned code sections clearly and unambiguously incorporate state and local housing laws and evince congressional intent to apply federal, state and local housing regulations, without limitation, to the management of military housing located on federal enclaves. Congress clearly enacted these statutes for a specific purpose: to ensure that military housing management companies, including Defendants, comply with all federal, state and local housing laws.

197.    In view of the foregoing, Plaintiffs are entitled to a declaration that the federal enclave doctrine does not bar Plaintiffs' claims against Defendants and, instead, that all federal, state and local laws apply as expressly set forth in the MHPI.

    **WHEREFORE,** Plaintiffs pray for judgment in their favor against Defendants as follows:

1.    General, special, and consequential damages in an amount to be proven at trial;

2.    A declaration that the federal enclave doctrine does not bar Plaintiffs' claims against Defendants and, instead, that all federal, state and local laws apply as expressly set forth in the MHPI;

3.    Reasonable attorneys, fees and costs;

4.    Punitive damages for Defendants' reckless and grossly negligent conduct; and

5.    For such other and further relief as the Court may deem just and proper.

BAUER & METRO, PC

s/ Robert S. Metro
Robert S. Metro (#12680)
Rob@bauermetro.com
P.O. Box 7965
Hilton Head, SC 29938
(843) 842-5297

-and-

PARKER LAW GROUP, LLP
Ronnie L. Crosby (#6311)
rcrosby@parkerlawgroupsc.com
Derek D. Tarver (#12729)
dtarver@parkerlawgroupsc.com
P.O. Box 487
Hampton, SC 29924
(803) 903-1781

*ATTORNEYS FOR PLAINTIFFS*

November 18, 2024